UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>  )<br>Plaintiff,  )<br>  )<br>v.  )<br>  )<br>THUNDER DIESEL & PERFORMANCE CO.,  )<br>  )<br>  )<br>  )<br>RED DEER EXHAUST, INC.  )<br>(d/b/a Flo~Pro Performance Exhaust),  )<br>  )<br>and  )<br>  )<br>SCHUMACHER ESTATES LTD.,  )<br>  )<br>  )<br>Defendants.  )<br>  ) | Civil Action No.: 3:22-cv-03042-TLB |

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States and at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as follows:

### I.    NATURE OF THE CASE

1.    This is a civil action brought under the Clean Air Act ("CAA") seeking injunctive relief and the assessment of civil penalties against Thunder Diesel & Performance Co. ("Thunder Diesel") and Red Deer Exhaust, Inc. d/b/a Flo~Pro Performance Exhaust ("Flo~Pro") (collectively "CAA Defendants") for CAA violations related to Defendants' manufacture, sale, and/or offer to sell numerous aftermarket products that bypass, defeat, or render inoperative emission controls installed on motor vehicles or engines.  *See* 42 U.S.C. §§ 7522–24.  The United States also brings this action pursuant to the Federal Debt Collection Procedures Act ("FDCPA") seeking to unwind or to recover certain transfers made from Thunder Diesel to Schumacher Estates, Ltd. ("Schumacher Estates" or, collectively with Thunder Diesel, the "FDCPA Defendants").  *See* 28 U.S.C. §§ 3001-3308.

### II.    JURISDICTION

2.    This Court has jurisdiction over the subject matter of and the parties to this action pursuant to Sections 204 and 205 of the CAA, 42 U.S.C. §§ 7523 and 7524, and 28 U.S.C. §§ 1331 (Federal Question), 1345 (United States as Plaintiff), and 1355 (Fine, Penalty, or Forfeiture).

3.    This Court has personal jurisdiction over Thunder Diesel, which is registered in Arkansas and has its principal place of business in this District.

4.      This Court has personal jurisdiction over Flo~Pro under Arkansas Code § 16-4-101 because Flo~Pro transacts business in Arkansas.  In addition, this Court's exercise of jurisdiction over Flo~Pro is consistent with due process.

5.      Among other things, Flo~Pro interacts with Thunder Diesel, which is located in this judicial district, including through sales of its products to Thunder Diesel.  Additionally, in April 2018, the Flo~Pro website, http://www.flopro.com/dealer.html, identified several "Local Dealers" and/or "service providers" in Arkansas for its products.

6.      This Court also has personal jurisdiction over Schumacher Estates under Arkansas Code § 16-4-101.  Schumacher Estates has conducted financial transactions with Thunder Diesel, which is located in this judicial district.  This Court's exercise of jurisdiction over Schumacher Estates is consistent with due process.

7.      Venue is proper in the Western District of Arkansas because it is the judicial district in which the Defendants are located, reside, are doing business, or in which a substantial part of the alleged violations in the Complaint occurred.  *See* 28 U.S.C. §§ 1391(b)(2), 1391(c)(2), and 1395(a); 42 U.S.C. §§ 7523 and 7524.

### III.    <u>DEFENDANTS</u>

8.      Thunder Diesel & Performance Co. is an Arkansas corporation with its principal office at 1835 South College Spur, Mountain Home, Arkansas.  Thunder Diesel has identified "FLO-PRO Performance Exhaust" as a fictitious name for the company with the Arkansas Secretary of State.

9.      Red Deer Exhaust, Inc. is a corporation with its principal office at 5233 – 49 Avenue, Red Deer, Alberta, Canada.  Red Deer Exhaust, Inc. does business under the name Flo~Pro Performance Exhaust.

3

10.    Schumacher Estates, Ltd. is a corporation with its principal office at 5233 – 49 Avenue, Red Deer, Alberta, Canada.

11.    Each CAA Defendant is a "person" within the meaning of Section 302(e) of the CAA, 42 U.S.C. § 7602(e).

12.    Schumacher Estates, Ltd. is a person within the meaning of 28 U.S.C. § 3002(10), an "insider" within the meaning of 28 U.S.C. § 3301(5)(A)(iv), and a person to whom a fraudulent transfer was made within the meaning of 28 U.S.C. § 3304.

## IV.    BACKGROUND

### A.    Statutory and Regulatory Overview of the Clean Air Act

13.    In creating the CAA, Congress found that "the increasing use of motor vehicles . . . has resulted in mounting dangers to the public health and welfare."  42 U.S.C. § 7401(a)(2).

14.    "Motor vehicle" is defined in the CAA as "any self-propelled vehicle designed for transporting persons or property on a street or highway."  42 U.S.C. § 7550(2); 40 C.F.R. § 85.1703.

15.    Title II of the CAA and the regulations promulgated thereunder establish standards for the emissions of air pollutants from motor vehicles and motor vehicle engines that "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."  42 U.S.C. § 7521(a).  These pollutants include nitrogen oxides ("$NO_x$"), particulate matter ("PM"), non-methane hydrocarbons ("NMHCs"), and carbon monoxide ("CO").  42 U.S.C. § 7521(a)(3)(A).

16.    EPA has also established National Ambient Air Quality Standards for certain pollutants, including ozone, $NO_x$, PM, and CO.  *See* 40 C.F.R. §§ 50.1-50.19.

### B. Criteria Pollutants under the Clean Air Act

17.     Ozone (ground level) is a highly reactive gas that is formed in the atmosphere from emissions of other pollutants, including emissions from motor vehicles.

18.     PM is a form of air pollution composed of microscopic solids and liquids suspended in air.  PM is emitted directly from motor vehicles and is also formed in the atmosphere from other pollutants, including pollutants emitted from motor vehicles.

19.     $NO_x$ and NMHCs are reactive gases that contribute to the formation of ozone and PM.

20.     Exposure to ozone and PM is linked to respiratory and cardiovascular health problems as well as premature death.  Children, older adults, people who are active outdoors (including outdoor workers), and people with heart or lung disease are particularly at risk for health effects related to ozone or PM exposure.

21.     Carbon monoxide is a toxic gas that forms when the carbon in fuel does not burn completely.  Carbon monoxide is harmful to human health because it reduces oxygen delivery to the body's organs and tissues.  Carbon monoxide can cause headaches, dizziness, vomiting, nausea, loss of consciousness, and death.  Long-term exposure to carbon monoxide has been associated with an increased risk of heart disease.

### C. EPA's Certificate of Conformity Program for New Motor Vehicles and Motor Vehicle Engines

22.     Manufacturers of new motor vehicles or motor vehicle engines must apply for and obtain a certificate of conformity ("COC") from EPA to sell, offer to sell, or introduce or deliver for introduction into commerce any new motor vehicle or motor vehicle engine in the United States.  42 U.S.C. § 7522(a)(1).

23.     To obtain a COC, the original equipment manufacturer ("OEM") must demonstrate that the motor vehicle or motor vehicle engine will conform to established emissions standards for $NO_x$, PM, NMHCs, CO, and other pollutants during the motor vehicle or motor vehicle engine's useful life. 42 U.S.C. § 7525(a)(2); *see* 40 C.F.R. §§ 86.007-30(a)(1)(i), 86.1848-01(a)(1).

24.     The COC application must include a description of the motor vehicle's emission control system and fuel system components. 40 C.F.R. §§ 86.094-21(b)(1), 86.1844-01(d)–(e).

25.     Once issued by EPA, a COC covers only those new motor vehicles or motor vehicle engines that conform in all material respects to the specifications provided to EPA in the COC application for such vehicles or engines. 40 C.F.R. § 86.1848-01(c)(6).

**D.  Acts Prohibited by Section 203 of the Clean Air Act**

26.     Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B), states that the following acts are prohibited:

> for any person to manufacture or sell, offer to sell, or install, any part or component intended for use with, or as a part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations  [promulgated under Title II of the CAA], and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use.

27.     Section 203(a) also prohibits any person from causing a violation of Section 203(a)(3)(A) or (B). 42 U.S.C. § 7522(a).

28.     Any person violating Section 203(a)(3)(B) of the CAA is subject to injunctive relief and civil penalties of up to $3,750 for each violation occurring on or after January 13,

6

2009, through November 2, 2015, and up to $5,179 for each violation occurring after

November 2, 2015.  42 U.S.C. §§ 7523, 7524(a); 40 C.F.R. § 19.4.

29.    Each part or component manufactured, sold, or offered for sale, in violation of

Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B), is a separate violation of Section

203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B).  42 U.S.C. § 7524(a).

### E.  Emissions-Related Elements of Design

30.    An "element of design" is "any control system (i.e., computer software, electronic

control system, emission control system, computer logic), and/or control system calibrations,

and/or the results of systems interaction, and/or hardware items on a motor vehicle or motor

vehicle engine."  40 C.F.R. §§ 86.094-2 and 86.1803-01 (General Compliance Provisions for

Control of Air Pollution from New and In-Use Light-Duty Vehicles, Light-Duty Trucks, and

Heavy-Duty Vehicles).

31.    An "emission control system" is a "unique group of emission control devices,

auxiliary emission control devices, engine modifications and strategies, and other elements of

design designated by the Administrator [of EPA] used to control exhaust emissions of a vehicle."

40 C.F.R. § 86.1803-01.

32.    OEMs install a variety of software and hardware elements of design and emission

control systems in motor vehicles and motor vehicle engines to monitor and control emissions of

pollutants in order to comply with the CAA and the regulations promulgated thereunder and to

obtain a COC.  These elements of design and emission control systems are hereinafter referred to

in this Complaint as "Emissions-Related Elements of Design."

33.    Emissions-Related Elements of Design generally include both the specific

hardware described in Paragraphs 34 – 39 below and the software that controls operation of that

hardware.

34.     Motor vehicles are equipped with dozens of electronic control units ("ECUs"), which are on-board computer systems that run software that monitors and controls vehicle operations, including the operation of Emissions-Related Elements of Design.  The ECU for the engine is called the engine control module ("ECM").

35.     Motor vehicles are also equipped with auxiliary emission control devices ("AECDs") which are Emissions-Related Elements of Design that sense temperature, motive speed, engine RPM, transmission gear, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of a motor vehicle's emission control system.  40 C.F.R. § 1037.801.

36.     Diesel engines produce high combustion temperatures that result in the production of $NO_x$.  An Exhaust Gas Recirculation System ("EGR System") reduces $NO_x$ emissions by recirculating a portion of engine exhaust gas back through the engine's cylinders, thereby lowering combustion temperature and reducing $NO_x$ formation.  The EGR System includes but is not limited to the EGR cooler, throttle valve, other valves, piping, flanges and gaskets as well as various other hardware, parts, sensors, subassemblies, AECDs, ECU software (calibrations) and other components that collectively constitute the system for implementing this emissions control strategy.  The EGR System is a "device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [CAA] regulations" within the meaning of Section 203(a)(3)(B) of the CAA, and is also an "Emissions-Related Element of Design."

37.     As an alternative or in addition to EGRs, OEMs typically equip motor vehicles with one or more Aftertreatment Systems "whose design function is to reduce emissions in the engine exhaust before it is exhausted to the environment."  *See* 40 C.F.R. § 1068.30.  A motor vehicle's Aftertreatment System consists of hardware installed in the stock exhaust system, as

well as software that runs on one or more ECUs and directs operation of the hardware

components. Diesel Particulate Filters ("DPFs"), Diesel Oxidation Catalysts ("DOCs"),

Selective Catalytic Reduction ("SCR") Systems, and $NO_x$ Adsorption Catalysts ("NACs") are

components of the Aftertreatment System that OEMs employ to control the emission of

pollutants and meet EPA-emission standards.

      a.     A DPF is a filter that captures soot from engine exhaust, thereby

decreasing PM emissions. By design, soot that collects in the DPF is periodically burned off by

elevated exhaust temperatures in a process referred to as active or passive regeneration. The

DPF includes all hardware, parts, sensors, subassemblies, AECDs, ECU software (calibrations),

and other components that collectively constitute the system for implementing this emissions

control strategy. The DPF is a "device or element of design installed on or in a motor vehicle or

motor vehicle engine in compliance with [CAA] regulations" within the meaning of Section

203(a)(3)(B) of the CAA, and is also an Emissions-Related Element of Design.

      b.     A DOC (a type of "catalytic converter" or "catalyst") is a precious-metal

coated, flow-through honeycomb structure. As exhaust gas passes through the DOC, the coating

of precious metal causes a catalytic reaction that breaks down CO and NMHCs in the exhaust

into their less harmful components. The DOC includes all hardware, parts, sensors,

subassemblies, AECDs, ECU software (calibrations), and other components that collectively

constitute the system for implementing this emissions control strategy. The DOC is a "device or

element of design installed on or in a motor vehicle or motor vehicle engine in compliance with

[CAA] regulations" within the meaning of Section 203(a)(3)(B) of the CAA, and is also an

Emissions-Related Element of Design.

c.      A SCR system (a type of "catalytic converter" or "catalyst") reduces $NO_x$ emissions by chemically converting exhaust gas that contains $NO_x$ into nitrogen and water through the injection of diesel exhaust fluid, typically composed of urea.  The SCR includes all hardware, parts, sensors, subassemblies, AECDs, ECU software (calibrations) and other components, that collectively constitute the system for implementing this emissions control strategy.  The SCR is a "device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [CAA] regulations" within the meaning of Section 203(a)(3)(B) of the CAA, and is also an Emissions-Related Element of Design.

d.      A NAC (a type of "catalytic converter" or "catalyst") reduces $NO_x$ emissions by chemically adsorbing $NO_x$ from exhaust gas.  The NAC includes all hardware, parts, sensors, subassemblies, AECDs, ECU software (calibrations) and other components that collectively constitute the system for implementing this emissions control strategy.  The NAC is a "device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [CAA] regulations" within the meaning of Section 203(a)(3)(B) of the CAA, and is also an Emissions-Related Element of Design.

38.      The CAA requires OEMs to install an On-Board Diagnostics System ("OBD System") on motor vehicles.  42 U.S.C. § 7521(m).  The OBD System monitors, detects, reports, and records malfunctions of monitored Emissions-Related Elements of Design and other components through the controller area network installed throughout the motor vehicle or motor vehicle engine.  40 C.F.R. §§ 86.007-17, 86.010-18, 86.1806-05.  The OBD System monitors sensor inputs for malfunction or deterioration that could cause a vehicle to fail to comply with CAA emissions standards and may command the ECU to alter vehicle operation so that malfunctions can be corrected.  The OBD System includes hardware, parts, sensors,

subassemblies, AECDs, ECU software (calibrations) and other components that collectively constitute the system. The OBD System is a "device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [CAA] regulations" within the meaning of Section 203(a)(3)(B) of the CAA, and is also an Emissions-Related Element of Design.

     a.    CAA regulations require that when the OBD System detects a malfunction of an emissions-related system or component, it must illuminate the vehicle's malfunction indicator light ("MIL" or "check engine light") on the dashboard. *See* 40 C.F.R. § 86.1806-05(b)-(d).

     b.    CAA regulations require that once the MIL is illuminated, the OBD must record a diagnostic trouble code ("DTC"). 40 C.F.R. § 86-1806-05(e). The OBD stores DTCs that service personnel can read in order to diagnose and repair a vehicle and government inspectors can download to verify a vehicle's compliance with emissions standards.

     c.    For certain issues, the OBD may also prompt a driver to correct a problem by altering vehicle performance, such as by putting the vehicle into "limp-home mode." *See* 40 C.F.R. § 86.010-2. In limp-home mode, the ECU commands the engine to downgrade in performance so that the driver is aware that there is a problem, such as with the emission control system, while permitting the vehicle to be driven (albeit slowly) to a service station. *See, e.g.,* 40 C.F.R. § 86.004-25(b)(6)(ii) (requiring the vehicle performance to deteriorate to a point unacceptable for typical driving when DEF replenishment is required).

    39.    <u>Certified Stock Calibrations.</u> OEMs install a suite of pre-set software calibrations for operational parameters ("Certified Stock Calibrations"). These calibrations control all aspects of vehicle and engine operation including combustion, performance, and operation of

EGR and Aftertreatment Systems. The Certified Stock Calibrations for a particular engine operate together to minimize and/or control the formation and emission of pollutants and ensure the motor vehicle or motor vehicle engine can meet applicable emissions requirements in the CAA and regulations promulgated thereunder. These calibrations are disclosed in the COC for each vehicle model because the Certified Stock Calibrations are an important part of a motor vehicle's overall emissions control strategy. *See* 40 C.F.R. § 86.1844-01(e)(2) (requiring that fuel pump flow rate, fuel pressure, engine speed, EGR exhaust gas flow rate, and basic engine timing be included in the COC application). Each Certified Stock Calibration is an "element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [CAA] regulations" within the meaning of Section 203(a)(3)(B) of the CAA, and is also an Emissions-Related Element of Design. The types of Certified Stock Calibrations relevant to this Complaint include but are not limited to:

      a.      calibrations for parameters that affect the operation of the EGR System including EGR flowrate and EGR cooler bypassing;

      b.      calibrations for parameters that affect the operation of Aftertreatment System (the DPF, DOC, SCR, and/or NAC);

      c.      calibrations for parameters that affect engine combustion, performance, and operation, including air-fuel ratio, fuel injection timing, fuel quantity, fuel injection pulse width, fuel injection pressure, fuel injection mass, multiple injection patterns, open loop/closed loop functionality and control, ignition control (spark timing), boost pressure, limiters (fuel, torque, smoke, etc.), manifold pressure, camshaft timing, electronic throttle control, engine air flow characteristics, mass air flow rate, turbocharger/supercharger air flow, and other parameters

disclosed on the COC which are elements of the OEM's strategy to control the formation of pollutants in the engine.

> d.     calibrations for parameters that affect OBD detection, warning, and recording of malfunctions.

### F.  Types of Aftermarket Products at Issue in this Case

40.     Third parties, including the CAA Defendants, manufacture, sell, and offer to sell products for use with existing motor vehicles that are designed to enhance the vehicle's power, performance, or fuel economy (hereinafter "Aftermarket Performance Products").  In some cases, these products achieve their purpose by replacing, modifying, bypassing, rendering inoperative, facilitating deletion or partial deletion of, interfering with, and/or over-writing OEM-installed Emissions-Related Elements of Design.  Such products "bypass, defeat, or render inoperative" Emissions-Related Elements of Design within the meaning of Section 203(a)(3)(B) of the CAA.  The Aftermarket Performance Products relevant to this Complaint fall into the following three categories: EGR Delete Hardware Products, Aftertreatment System Delete Hardware Products, and Tunes.

41.     <u>EGR Delete Hardware Products.</u>  Some aftermarket hardware products physically replace, modify, bypass, render inoperative, facilitate deletion or partial deletion of, and/or interfere with, components of the EGR System.  These include but are not limited to exhaust manifolds that do not incorporate EGR ports designed for an engine with exhaust manifolds that contain EGR ports, plates that block the EGR system (known as "blocker plates" or "block off"), and hardware to force the throttle valve to remain fully open, which inhibits EGR flow (referred to as "throttle valve delete" equipment).  These products are collectively referred to in this Complaint as "EGR Delete Hardware Products."

42.    <u>Aftertreatment System Delete Hardware Products.</u>  Some aftermarket hardware products physically alter some or all components of a motor vehicle's Aftertreatment System by replacing, modifying, bypassing, rendering inoperative, facilitating deletion or partial deletion of, or interfering with essential physical elements of the DPF, DOC, SCR, or NAC.  This often involves removing the Aftertreatment System installed by the OEM, and replacing it with a "straight pipe" or "race pipe."  The replacement hardware does not contain emission controls such as DPF, SCR, DOC, and NAC.  These products are collectively referred to in this Complaint as "Aftertreatment System Delete Hardware Products."

43.    <u>Tuners and Tunes.</u>  Other aftermarket products consist of a device that carries software coding designed to alter elements of design governing engine performance, and to override the OBD systems.  Tuners plug into the OBD port and override, erase, or reprogram the ECM with software or electronic files known as "tunes."  Tunes are the software that is uploaded into a motor vehicle's ECUs and replaces, modifies, bypasses, renders inoperative, facilitates deletion or partial deletion of, overwrites, and/or interferes with one or more of a motor vehicle's or motor vehicle engine's Certified Stock Calibrations.  An individual piece of such software is commonly referred to as a "Tune," derived from its intended purpose of "tuning" the vehicle's performance.  The Tuners and Tunes relevant to this Complaint are referred to hereinafter as "Defeat Tuners" and "Defeat Tunes."

a.    There are various methods by which Defeat Tunes may be programmed into the vehicle.  Most commonly, tunes are uploaded from a handheld device called a "tuner," or through cloud-based technology.

b.    A single Defeat Tune can alter, disable, bypass, delete and/or over-write multiple Certified Stock Calibrations and types of Certified Stock Calibrations.  For example, a

14

tune that disables the EGR also typically changes OBD-related calibrations so that the EGR deletion will not be detected.  Multiple Tunes and types of Tunes are often sold together as a single product.

        c.      The Defeat Tunes relevant to this Complaint delete, modify, or overwrite the following types of Certified Stock Calibrations:

    i. <u>Certified Stock Calibrations relating to the EGR System</u>.  For example, this type of Defeat Tune may electronically disable the EGR System or alter EGR-related Certified Stock Calibrations such as EGR exhaust gas flow rate.

    ii. <u>Certified Stock Calibrations relating to Aftertreatment Systems</u> (the DPF, DOC, SCR, or NAC).  For example, this type of Defeat Tune may alter urea injection calibrations or DPF regeneration intervals.

    iii. <u>Certified Stock Calibrations relating to engine combustion, performance, and operation</u>. For example, this type of Defeat Tune may alter, bypass, delete, and/or over-write the Certified Stock Calibrations for combustion parameters that affect emissions such as air-fuel ratio, fuel injection timing, fuel quantity, fuel injection pressure, and fuel injection pulse width.

    iv. <u>Certified Stock Calibrations relating to OBD functions</u>.  For example, this type of Defeat Tune may prevent the generation and recording of DTCs and may prevent the OBD from putting the vehicle into "limp-home mode" due to changes in Certified Stock Calibrations or removal of or changes to the EGR System or Aftertreatment System.

**G.  The Statutory Authority of the Federal Debt Collection Procedures Act**

    44.      Under the FDCPA, "a transfer made . . . by a debtor is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made . . . (1) if the debtor makes the transfer . . . with actual intent to hinder, delay, or defraud a creditor," or (2) if

the debtor (a) does not receive reasonably equivalent value in exchange for the transfer and (b) "believed or reasonably should have believed that [the debtor] would incur [] debts beyond [its] ability to pay as they became due."  28 U.S.C. § 3304(b).

45.    The FDCPA lists factors—known as the *badges of fraud*—that may be considered in determining actual intent to defraud a creditor.  28 U.S.C. § 3304(b)(2).  The badges of fraud include, but are not limited to: whether the transfer was to an insider, whether the debtor retained possession after the transfer, whether the transfer occurred after the debtor had been sued or threatened with suit, whether the transfer was of all or substantially all of the debtor's assets, whether the value of consideration received for the transferred asset was reasonably equivalent to the value of the transferred asset, whether the debtor was insolvent or became insolvent shortly after the transfer was made, and whether the transfer occurred shortly before or shortly after a substantial debt was incurred.  28 U.S.C. § 3304(b)(2).

46.    The FDCPA defines "insider: as including: a director of the debtor; an officer of the debtor; and a relative of a director, officer, or person in control of the debtor.  28 U.S.C. § 3301(5)(B).

47.    The FDCPA provides the United States with several remedies for a fraudulent transfer: "(1) avoidance of the transfer . . . to the extent necessary to satisfy the debt to the United States; (2) a remedy [under the FDCPA] against the asset transferred or other property of the transferee; or (3) any other relief the circumstances may require."  28 U.S.C. § 3306(a).

48.    The FDCPA provides "judgment may be entered against the first transferee of the asset or the person for whose benefit the transfer was made" or "any subsequent transferee, other

16

than a good faith transferee who took for value or any subsequent transferee of such good-faith [sic] transferee."  28 U.S.C. § 3307(b)(1).

## V.    <u>GENERAL ALLEGATIONS</u>

49.    Each CAA Defendant has manufactured, sold, and/or offered to sell, and/or caused the manufacture, sale, and/or offer for sale of numerous products intended for use in "motor vehicles" as that term is defined by the CAA, 42 U.S.C. § 7550(2), and regulations promulgated thereunder at 40 C.F.R. § 85.1703.

50.    Many of the products that the CAA Defendants manufactured, sold, and/or offered to sell, and/or caused the manufacture, sale, and/or offer for sale of, are Aftermarket Performance Products that modify a motor vehicle's fuel economy, power, and performance.

51.    Flo~Pro has manufactured and then sold Aftermarket Performance Products to Thunder Diesel, who served as a distributor for these parts, and to other customers.

52.    Through at least November 2019, Thunder Diesel sold and/or offered to sell Aftermarket Performance Products over the internet through its website, www.thunderdiesel.com.  Thunder Diesel also advertised through Facebook.

53.    Flo~Pro has manufactured, sold and/or offered to sell the following types of Aftermarket Performance Products:  Aftertreatment Hardware Products and EGR Delete Hardware Products.

54.    Thunder Diesel has sold and/or offered to sell the following types of Aftermarket Performance Products:  EGR Delete Hardware Products, Aftertreatment Hardware Products, and Defeat Tunes.

55.     EGR Delete Hardware Products, Aftertreatment Hardware Products, and Defeat Tunes that Defendants manufactured, sold, and/or offered to sell, have a principal effect of bypassing, defeating, and/or rendering inoperative Emission-Related Elements of Design.

**A. Flo~Pro and Thunder Diesel's EGR Delete Hardware Products**

56.     As of March 2, 2021, Flo~Pro's website, www.flopro.com, displayed a product category called "EGR Race Kits."

57.     The product names for certain of the CAA Defendants' EGR Delete Hardware Products contain the word "block-off."  For example, Flo~Pro's 2018 catalog offered products with the following product names:

- "EGR Block-off Dodge 07.5-16"

- "EGR Block-off GM CC 04-06"

- "EGR Block-off Plates" for "2004-2016 GMC EGR Kits"

- "EGR Block-off Ford 08-10"

58.     The product names for certain of Thunder Diesel's EGR Delete Hardware Products contain the word "delete," "block-off," or "blocker."  For example, some of the products Thunder Diesel sold have the following product names:

- "GM LMM Blocker Plate"

- "Dodge 09-16 Deluxe EGR Delete"

- "Ford EGR Delete 11-14"

59.     Flo~Pro's descriptions of certain of its EGR Delete Hardware Products indicate that these products replace, facilitate deletion or partial deletion of, and/or interfere with the EGR System.  For example, the Flo~Pro installation manual for the "EGR & Cooler Delete for

2007.5-2016 6.7L Cummins" states: "EGR Race Kit Will: - Allow removal of the EGR assembly[.]"

60.     The product manuals and/or installation instructions for certain of the CAA Defendants' EGR Delete Hardware Products contain instructions on how to remove and replace all or part of the OEM's EGR System.  For example, the Flo~Pro product installation manual for the "EGR & Cooler Delete for 2007.5-2016 6.7L Cummins" reads: "STEP 14: Remove the exhaust crossover elbow that is held in place by two 15mm nuts.  Install the smaller of the two exhaust block off plates."

61.     The product descriptions for certain of the CAA Defendants' EGR Delete Hardware Products state that the product must be used with tuning that disables the EGR System. For example, the Flo~Pro product installation manual for the "EGR & Cooler Delete for 2007.5-2016 6.7L Cummins" includes the following: "WARNING ONLY install this kit if you are using a tuner that disables the EGR sensors & circuit system."

**B.  Flo~Pro and Thunder Diesel's Aftertreatment Hardware Products**

62.     The CAA Defendants' website displayed product categories called "Performance Exhaust Systems."

63.     The product manuals and/or installation instructions for certain of Defendants' Aftertreatment System Delete Hardware Products contain instructions on how to remove and replace all or part of the OEM's Aftertreatment System.  For example, the Flo~Pro product installation manual for the 2007 Dodge Ram 2500/3500 6.7L 4" Downpipe/DPF Race System instructions states: "REMOVAL OF ORIGINAL SYSTEM…remove the downpipe and DPF."

64.     The CAA Defendants' product manuals and/or descriptions for certain of Defendants' Aftertreatment System Delete Hardware Products state that the products must be used with delete tuning.  For example, the Flo~Pro product installation manual for the 2007

19

Dodge Ram 2500/3500 6.7L 4" Downpipe/DPF Race System instructions states: "Wiring harness or tuner required for proper operation."

### C. Thunder Diesel's Defeat Tunes

65.     Thunder Diesel's descriptions of certain of its Defeat Tunes indicate that these products replace, modify, bypass, render inoperative, facilitate deletion or partial deletion of, over-write, and/or interfere with operation of the EGR System, Aftertreatment System, Certified Stock Calibrations, and the OBD System.  For example, the description of Thunder Diesel's "RME-ULTRA Tuner" describes how the tuner interferes with the Aftertreatment System by disabling the DPF and related sensors, thereby interfering with the OBD System and Certified Stock Calibrations by disabling sensors.  Part of the description states: "Disable the DPF/DEF System And ALL Related Sensors – No Sensors Required To Be Plugged In or Installed In Race Exhaust."

66.     The product manuals and/or installation instructions for certain Defeat Tunes Thunder Diesel sold illustrate how they bypass, defeat, or render inoperative the EGR, DPF, DOC, SCR, NAC, and OBD.  For example, instruction manuals for some of Thunder Diesel's Defeat Tunes include the following statements: "Click on Main Menu to ECM Tuning & DTC…Choose between Deletes Only – Only Stock Power or With Increased Power."

67.     At all relevant times herein, Defendants knew or should have known that one or more of the EGR Delete Hardware Products, Aftertreatment Hardware Products, and/or Defeat Tunes they manufactured, sold, and/or offered to sell were intended for such use or put to such use.

**D.  EPA's Notice of Violation and Information Request to Thunder Diesel**

68.    On July 24, 2018, EPA issued an information request under Section 208 of the CAA to Thunder Diesel related to the number and types defeat devices the CAA Defendants manufactured, sold, and or offered for sale.

69.    On February 7, 2019, EPA issued a Finding of Violation ("FOV") to Thunder Diesel, alleging 191,044 violations of Section 203(a)(3)(B) of the CAA.

70.    The FOV was based on the information EPA discovered investigating the CAA Defendants' websites and Facebook pages, and responses to the information request.

71.    The FOV described the products that were the subject of these violations, listing the products by name and explaining the illegal effect on various Emission-Related Elements of Design.

72.     The FOV stated, "Persons violating Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B), are subject to an injunction under Section 204 of the CAA, 42 U.S.C. § 7523, and a civil penalty of up to $4,619 for each violation."

73.    The United States has a "claim" for civil penalties under the CAA against the CAA Defendants within the meaning of 28 U.S.C. § 3301(3) (defining a "claim" as a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured").

74.    The United States is a "creditor" within the meaning of 28 U.S.C. § 3301(d).

75.    The United States' claim to recover civil penalties from the CAA Defendants is a "debt" within the meaning of 28 U.S.C. § 3002(3)(B) (defining "debt" to include a penalty or fine).

76.    Thunder Diesel is a "debtor" to the United States within the meanings of 28 U.S.C. § 3002(4).

21

### E.  Transfer of Assets from Thunder Diesel to Schumacher Estates Ltd.

77.    In March of 2019 and August 2020, Thunder Diesel paid a total of $2.75 million in dividends to Schumacher Estates Ltd.

78.    Schumacher Estates is a transferee against whom the United States may recover judgment under the FDCPA, 28 U.S.C. § 3307(b).

## FIRST CLAIM FOR RELIEF
### *Violations for the Manufacture, Sale, and/or Offer to Sell: EGR Delete Hardware Products*

79.    The United States re-alleges Paragraphs 1 through 78 above as if fully set forth herein.

80.    From January 2016 through at least February 2019, the CAA Defendants manufactured, sold, and/or offered to sell, and/or caused the manufacture, sale, and/or offer to sell, thousands of different EGR Delete Hardware Products.  The CAA Defendants' EGR Delete Hardware Products include but are not limited to blocker plates, EGR cooler delete kits, EGR delete, and throttle valve delete kits.

81.    A motor vehicle's EGR System is "a device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [CAA] regulations" within the meaning of Section 203(a)(3)(B) of the CAA.

82.    Each of the CAA Defendants' EGR Delete Hardware Products is, and at all relevant times herein was, intended for use with certified motor vehicles and motor vehicle engines, including Powerstroke engines in Ford vehicles, Duramax engines in GM vehicles, and Cummins engines in Dodge vehicles.

83.    A principal effect of each of the CAA Defendants' EGR Delete Hardware Products is, and at all relevant times herein was, to bypass, defeat, or render inoperative a motor vehicle's EGR System.

84.     Defendants knew or should have known that each of the CAA Defendants' EGR Delete Hardware Products was intended for such use or put to such use.

85.     Each unit of the CAA Defendants' EGR Delete Hardware Products that the CAA Defendants manufactured, sold, or offered for sale, or that Defendants caused to be manufactured, sold, or offered to sell, is a separate violation of Section 203(a)(3)(B) of the CAA. 42 U.S.C. § 7524(a).

86.     For each violation of Section 203(a)(3)(B), the CAA Defendants are each liable to the United States for injunctive relief and civil penalties of up to the amounts set forth in Paragraph 28 above.

## SECOND CLAIM FOR RELIEF
### *Violations for the Manufacture, Sale, and/or Offer to Sell: Aftertreatment System Delete Hardware Products/Exhaust Kits*

87.     The United States re-alleges Paragraphs 1 through 78 above as if fully set forth herein.

88.     From January 2016, through at least August 2019, the CAA Defendants manufactured, sold, and/or offered to sell, and/or caused the manufacture, sale, and/or offer to sell, numerous different types of Aftertreatment System Delete Hardware Products that bypass, defeat, and/or render inoperative one or more Aftertreatment Systems (hereinafter "CAA Defendants' Aftertreatment System Delete Hardware Products").  CAA Defendants' Aftertreatment System Delete Hardware Products include but are not limited to pipes commonly called "race pipes," "race CAT/DPF pipe," "DPF pipe," "delete pipes," and/or "straight pipes."

89.     A motor vehicle's Aftertreatment System including DPF, SCR, NAC, and DOC, is "a device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [CAA] regulations" within the meaning of Section 203(a)(3)(B) of the CAA.

23

90.     Each of CAA Defendants' Aftertreatment System Delete Hardware Products is, and at all relevant times herein was, intended for use with certified motor vehicles and motor vehicle engines, including Powerstroke engines in Ford vehicles, Duramax engines in GM vehicles, and Cummins engines in Dodge vehicles.

91.     A principal effect of each of CAA Defendants' Aftertreatment System Delete Hardware Products is, and at all relevant times herein was, to bypass, defeat, or render inoperative a motor vehicle's Aftertreatment System.

92.     CAA Defendants knew or should have known that each of Defendants' Aftertreatment System Delete Hardware Products was intended for such use or put to such use.

93.     Each unit of each of CAA Defendants' Aftertreatment System Delete Hardware Product Defendants is a separate violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B).  42 U.S.C. § 7524(a).

94.     For each violation of Section 203(a)(3)(B), CAA Defendants are each liable to the United States for injunctive relief civil penalties of up to the amounts set forth in Paragraph 28 above.

## THIRD CLAIM FOR RELIEF
### *Violations for the Sale and/or Offer to Sell: Defeat Tunes*

95.     The United States re-alleges Paragraphs 1 through 78 above as if fully set forth herein.

96.     From January 2016 through at least August 2019, Thunder Diesel sold and/or offered to sell, and/or caused the manufacture, sale, and/or offer to sell, numerous different types of Defeat Tunes.  Some of Thunder Diesel's Defeat Tunes modified or overwrote multiple Certified Stock Calibrations.

24

97.    Thunder Diesel's Defeat Tunes bypass, defeat, and/or render inoperative one or more of the following types of Certified Stock Calibrations:

a.    Certified Stock Calibrations relating to the EGR System, as well as signals or records related to the EGR System.

b.    Certified Stock Calibrations relating to the Aftertreatment System, including the DPF, DOC, SCR, or NAC, as well as signals or records related to these components.

c.    Certified Stock Calibrations related to engine combustion, performance and operation such as air-fuel ratio, fuel injection timing, fuel quantity, fuel injection pressure, and fuel injection pulse width.

d.    Certified Stock Calibrations related to OBD functions in order to prevent the generation of diagnostic trouble codes, prevent the malfunction indicator light from illuminating, and/or prevent the OBD from putting the vehicle into "limp-home mode" due to changes in Certified Stock Calibrations or removal of the EGR System or Aftertreatment System.

98.    Each Certified Stock Calibration is an "element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [CAA] regulations" within the meaning of Section 203(a)(3)(B) of the CAA.

99.    Each of Thunder Diesel's Defeat Tunes is, and at all relevant times herein was, intended for use with certified motor vehicles and motor vehicle engines, including Powerstroke engines in Ford vehicles, Duramax engines in GM vehicles, and Cummins engines in Dodge vehicles.

100.    A principal effect of each of Thunder Diesel's Defeat Tunes is, and at all relevant times herein was, to bypass, defeat or render inoperable a Certified Stock Calibration related to a

motor vehicle's EGR System, Aftertreatment System, engine operation and combustion, and/or OBD System.

101.    Thunder Diesel knew or should have known that each of its Defeat Tunes was intended for intended for such use or put to such use.

102.    Each unit of Thunder Diesel's Defeat Tunes that Thunder Diesel sold, or offered for sale is a separate violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B). 42 U.S.C. § 7524(a).

103.    For each violation of Section 203(a)(3)(B), Thunder Diesel is liable to the United States for injunctive relief and civil penalties of up to the amounts set forth in Paragraph 28 above.

## FOURTH CLAIM FOR RELIEF
### *Fraudulent Transfer under Section 3304(b)(1)(A) of the FDCPA*

104.    Paragraphs 1 through 78 of this Complaint are re-alleged and incorporated herein by reference.

105.    EPA issued a notice of Violation to Thunder Diesel on February 7, 2019, alleging at least 191,044 violations of the CAA.

106.    The FOV put Mr. Schumacher and his related corporate entities on notice of the potential penalties for these CAA violations by including the maximum penalty that could be assessed under the statute ($4,619 per product).

107.    Following receipt of an information request and a notice of violation issued to Thunder Diesel, Thunder Diesel transferred substantially all of its assets to Schumacher Estates with actual intent to hinder, delay, or defraud the United States within the meaning of Section 3304(b)(1)(A) of the FDCPA, 28 U.S.C. § 3304(b)(1)(A).

108.    Thunder Diesel made the transfers to avoid paying the United States a debt and in a manner that exhibits the badges of fraud set forth in Section 3304(b)(2) of the FDCPA, 28 U.S.C. § 3304(b)(2).  The transfers had the effect of hindering collection efforts and were fraudulent as to a debt to the United States under Section 3304(b)(1)(A) of the FDCPA, 28 U.S.C. § 3304(b)(1)(A).

109.    Thunder Diesel's transfers violated the FDCPA and the United States is entitled to recover up to the amount of the transfers between the FDCPA Defendants under 28 U.S.C. § 3307(b).

## RELIEF REQUESTED

WHEREFORE, the United States respectfully requests that this Court:

A.    Assess civil penalties against each CAA Defendant for each part or component Defendants manufactured or sold in violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B) or caused the manufacture or selling thereof, in the amount up to $3,750 occurring on or after January 13, 2009, through November 2, 2015, and up to $5,179 for each violation occurring after November 2, 2015.

B.    Permanently enjoin each CAA Defendant from manufacturing, selling, or offering to sell, motor vehicle parts or components intended for use with a motor vehicle or motor vehicle engine where a principal effect of such part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with Title II of the CAA;

C.    Order the CAA Defendants to take other appropriate actions to remedy, mitigate, and offset the harm caused by their alleged CAA violations;

D.    Enter judgment pursuant to 28 U.S.C. §§ 3306(a) and 3307(b) in favor of the United States against FDCPA Defendants, ordering each of them to pay the United States up to the amount of the fraudulent transfers, to the extent necessary to satisfy Thunder Diesel's debt under the CAA;

E.    Award such other and further relief as the Court may deem just and proper.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

*Samantha M. Ricci*
SAMANTHA M. RICCI
Trial Attorney
Cal. Bar 324517
Attorney for Plaintiff United States
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 532-3950
Email: samantha.ricci@usdoj.gov

DAVID CLAY FOWLKES
United States Attorney
Western District of Arkansas

SETH T. CREED
Assistant United States Attorney
United States Attorney's Office
Western District of Arkansas
(479) 249-9045

28

OF COUNSEL:

JOSH ZAHAROFF
Associate Regional Counsel
U.S. EPA, Region 5
77 W. Jackson Blvd.
Chicago, Illinois 60604

MATTHEW R. DAWSON
Associate Regional Counsel
U.S. EPA, Region 5
77 W. Jackson Blvd.
Chicago, Illinois 60604

MARK J. PALERMO
Attorney-Advisor
U.S. EPA Office of Enforcement and Compliance Assurance
1200 Pennsylvania Avenue NW
Washington, DC 20004

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 28, 2022, I electronically filed the Complaint with the Clerk of the Court using the CM/ECF system.  And I hereby certify that on July 28, 2022, I caused copies of the foregoing Complaint to be served on the following individuals by electronic mail:


Donald Schumacher
Red Deer Exhaust, Inc.
P.O. Box 783
Red Deer, Alberta Canada T4N5H2
dschumacher@flopro.com


Hazel Ocampo
Greenberg Traurig, LLP
18565 Jamboree Road Suite 500
Irvine, CA 92612
949 732-6545
ocampoh@gtlaw.com


Respectfully submitted,

Dated:  July 28, 2022                    s/ *Samantha M. Ricci*
                                         SAMANTHA M. RICCI
                                         Trial Attorney
                                         Cal. Bar 324517
                                         Attorney for Plaintiff United States
                                         Environmental Enforcement Section
                                         Environment and Natural Resources Division
                                         United States Department of Justice
                                         P.O. Box 7611
                                         Washington, DC 20044-7611
                                         Telephone: (202) 532-3950
                                         Email: samantha.ricci@usdoj.gov